UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

AT LAST SPORTSWEAR, INC.,

    *Plaintiff,*

v.                                                                                                13 CV 2355 (WHP)

MICHAEL KAMENS,

    *Defendant and Third-party Plaintiff,*                  AMENDED
                                                                                             COUNTERCLAIMS AND
v.                                                                                        THIRD-PARTY COMPLAINT

AT LAST SPORTSWEAR, INC.,
BONNI DUCHON,
SUNIL AHUJA, *and*
SANJAY ISRANI,

    *Third-Party Defendants.*

------------------------------------------------------------------X

Michael Kamens, by his attorneys, The Harman Firm, PC, submits this Amended Counterclaims to Plaintiff At Last Sportswear, Inc. (hereinafter "At Last"), and Third-Party Complaint against Third-Party Defendants At Last, Bonni Duchon, Sunil Ahuja, and Sanjay Israni.

        I.        <u>COUNTERCLAIMS AND THIRD-PARTY COMPLAINT</u>

    1.        At Last, Mr. Ahuja, and Mr. Israni fraudulently induced Mr. Kamens to enter into a contract by intentionally and grossly misrepresenting its sales, including and especially those to Wal-Mart.

    2.        Prior to working with Plaintiff and Third-Party Defendants, Mr. Ahuja, Mr. Israni, and Mr. Kamens agreed to the terms of the Key Employment Agreement (hereinafter referred to as "Agreement," and annexed hereto as *Exhibit A*.)

3.  By entering into the agreement, Mr. Kamens relied on the deliberately false representations of Wal-Mart sales and would never have entered into the agreement without such false representations.

4.  As a result of the fraud, Mr. Kamens suffered economic loss in that he:

    (i)  Forewent other business opportunities to work with Plaintiff and Third-Party Defendants; and

    (ii) Never received any expected sales commissions—it was not possible due to the fraud.

5.  To the extent that the Agreement is enforceable (*i.e.*, not void *ab initio* due to fraud), At Last breached the Agreement that it entered into with Mr. Kamens by eliminating his position of President of Sales or President (Sales).[1]

6.  At Last also breached the Agreement in numerous other material respects.

## A.  FRAUD

7.  At Last, Mr. Ahuja, and Mr. Israni with intent, fraudulently induced Mr. Kamens to enter into the Agreement by representing that At Last's sales figures were grossly higher than they really were in a deliberate effort to deceive Mr. Kamens so that he would enter into an employment agreement with At Last.[2]

8.  For example, Mr. Kamens was promised a bonus of fifty thousand dollars ($50,000) *per annum* issued in monthly payments, regardless of sales.

---

1. The Agreement refers to the job title using both styles interchangeably.

2. After the commencement of Mr. Kamens's employment, At Last granted him direct access to sales figures and to employees of Wal-Mart, which clearly evidenced At Last's and Third-Party Defendants' fraud. The numbers were nowhere near the representations used to coerce Mr. Kamens into working for At Last.

2

9.      Another example is Mr. Israni's representation regarding At Last's 2012 year-to-date sales and projections in April 2012. While Mr. Israni claimed that for 2012, At Last was "projecting gross sales to be [thirty-eight million dollars ($38,000,000)] and net sales to be around [thirty-five million to thirty-five million five hundred thousand dollars ($35–35,500,000)]," in reality, total At Last sales in 2012 were merely twenty-one million dollars ($21,000,000). As almost half of 2012 was over when At Last and Mr. Israni misled Mr. Kamens, it is impossible that they issued such figures in good faith.

10.     Prior to the signing of the Agreement, At Last, Mr. Ahuja, and Mr. Israni courted Mr. Kamens aggressively and doggedly for years due to the fact that Mr. Kamens's reputation in the industry was so strong.

11.     Mr. Ahuja and Mr. Israni repeatedly took Mr. Kamens out to lunch at Arno, an upscale Midtown restaurant.

12.     Upon information and belief, Mr. Ahuja and Mr. Israni were impressed by Mr. Kamens's experience and business acumen as an apparel-industry executive; they expressed their belief that Mr. Kamens was the ideal choice to provide strong leadership at At Last.

13.     Through these extensive preliminary communications, an agreement was reached and certain material aspects of it were reduced to writing in the Agreement: Mr. Kamens was to become President of Sales, in charge of all operations for At Last; he was hired to run the company.

14.     During the negotiation process, At Last, Mr. Ahuja, and Mr. Israni fraudulently induced Mr. Kamens to sign the Agreement, including lying about the amount of money that Mr. Kamens was to receive, which was grossly and deceptively exaggerated.

15. For example, during At Last's, Mr. Ahuja's, and Mr. Israni's professional courting of Mr. Kamens, Mr. Ahuja and Mr. Israni sent Mr. Kamens emails with material misrepresentations of At Last's finances.

16. In April 2012, At Last, Mr. Ahuja, and Mr. Israni deliberately deceived Mr. Kamens into believing that these sales to Wal-Mart would amount to thirty-five million to thirty-five million five hundred thousand dollars ($35–35,500,000) *per annum*.

17. The Agreement guarantees Mr. Kamens fifty-five one hundredths of one percent (0.55%) commission on factory-direct sales to Wal-Mart.

18. However, At Last's factory-direct sales to Wal-Mart were in fact entirely nonexistent, effectively and deliberately robbing Mr. Kamens of between one hundred ninety-two thousand five hundred dollars and one hundred ninety-five thousand two hundred fifty dollars ($192,500–$195,250). This is fraud.

19. Only due to his reliance on those fraudulent misrepresentations, Mr. Kamens signed the final version of the Agreement on August 6, 2012.

20. An aspect of the Agreement was unusual: a hand-scrawled note on the last page, which Mr. Ahuja instructed Mr. Kamens to initial.

21. The scrawling instructed Mr. Kamens to not talk to anyone about the Agreement until his first day of work.

22. In practice, the *ad hoc* addendum was a prohibition on speaking to anyone about any aspect of At Last—which, Mr. Kamens later realized, was a tactic specifically designed to prevent him from learning of the firm's actual poor financial condition and state of disarray.

23. Mr. Kamens had a primary reservation and concern prior to signing: At Last's continued employment of Ms. Duchon.

24.     This reservation and concern was due to the fact that Mr. Kamens was replacing Ms. Duchon's extramarital paramour.

25.     Prior to executing the Agreement, Mr. Ahuja promised Mr. Kamens that if Ms. Duchon became a problem, Mr. Kamens, as President and as her supervisor, would have the power to terminate her.

**B.     Tortious Interference**

26.     On December 4, 2012, Mr. Kamens's first day as President, Ms. Duchon began a campaign to attack him personally and to destroy his employment and business relationships.

27.     Ms. Duchon sought to harm Mr. Kamens in any way possible due to the fact that he had been selected to replace her extramarital paramour.

28.     This included both professional and personal attacks.

29.     Ms. Duchon intentionally and sought to destroy, with malice, Mr. Kamens, and his career.

30.     Ms. Duchon verbally harassed, badgered, and belittled Mr. Kamens. This behavior was repeated every workday, until later when she refused to speak with Mr. Kamens altogether, even though as President of Sales, he was her supervisor.

31.     Ms. Duchon berated and belittled Mr. Kamens in front of his employees[3] at corporate meetings, including announcing *e.g.*, "he doesn't have a clue," and "do not listen to him."

32.     On other occasions, Ms. Duchon made her malice and intentional injury to Mr. Kamens clear with statements including, "I'll make sure that you do not last here if it's the last

---

3. Those present during some of these occasions include, but are not limited to, David Orland, Shiv Sharma, Megan Rywelski, and Erlyn Ikeda.

5

thing I do." On at least one (1) occasion, she stated that in the presence of both Mr. Kamens and Shiv Sharma.

33. Ms. Duchon also told Mr. Kamens that "Whatever it takes, you're never gonna be involved with [sales to] Wal-Mart."

34. Nevertheless, Mr. Ahuja prevented Mr. Kamens from addressing Ms. Duchon's extreme and outrageous conduct let alone terminating her employment.

35. Moreover, Mr. Ahuja reassured Mr. Kamens every week that he would fire Ms. Duchon. That never occurred.

36. Mr. Ahuja emailed Mr. Kamens saying that he would handle the situation with Ms. Duchon. He never did, which further prevented Mr. Kamens from being able to perform his job.

37. In addition, Ms. Duchon was granted <u>greater</u> responsibility including duties that in fact belonged to Mr. Kamens. This all resulted in, as both a practical and contractual matter, the elimination of Mr. Kamens's position as President of Sales.

C. **Breach of Contract**

38. In addition to the fraud and assuming that the Agreement is not null and void due to that fraud, the Agreement was breached in numerous material respects, including:

    (i)    Mr. Kamens was prevented from performing his job duties;

    (ii)    Mr. Kamens was stripped of his job duties without notice, cause, or explanation; and

    (iii)    Mr. Kamens was not compensated in accordance with the terms of the Agreement and did not receive regular

payments which he was due under the Agreement, including but not limited to commission payments.

39. The Agreement was breached in numerous other material respects, starting from the very beginning of his employment. In his first month as President of Sales, Mr. Kamens was stripped of his responsibility for all production orders, and forced to concentrate only on sales.

40. Mr. Kamens's efforts to improve employees' efficiency and punctuality were at first supported by Mr. Ahuja.

41. However, when it became necessary for Mr. Kamens to discipline employees, Mr. Ahuja prevented Mr. Kamens from taking actions necessary to perform his job functions.

42. Nonetheless, for the time that he <u>was</u> allowed to perform job functions under the terms of the Agreement, Mr. Kamens's quality of work was exceptional, drawing effusive praise from his employees.

43. However, Mr. Kamens continued to suffer Ms. Duchon's constant harassment. Mr. Kamens frequently voiced his dissatisfaction with the situation to Mr. Ahuja.

44. On February 7, 2013, Mr. Kamens emailed Mr. Ahuja, writing, *inter alia*, "[Ms. Duchon's] harassment prevents me from doing my job effectively."

45. Mr. Ahuja wrote back that he would "take care of this issue."

46. Instead, Mr. Ahuja bizarrely and outrageously proposed <u>increasing</u> Ms. Duchon's area of responsibility to encroach on that of Mr. Kamens: Mr. Ahuja asked Mr. Kamens to give up his control over all aspects of "wovens" to Ms. Duchon, which accounted for approximately sixty-six percent (66%) of the firm's business.

47. Since Mr. Ahuja had breached Mr. Kamens's contract by taking away his job responsibilities as President of Sales, his job, as per the express terms of the Agreement, had been eliminated.

48. Many other At Last employees were also aware of this fact.

49. At Last employees who directly expressed their sympathy and support to Mr. Kamens included:

    (a)    Jamil Ahmed;

    (b)    Shiv Sharma;

    (c)    Rado Novacov;

    (d)    Megan Rywelski;

    (e)    David Orland; and

    (f)    Erlyn Ikeda.

50. As a representative example, Mr. Sharma told Mr. Kamens, "I realize they're trying to push you out; it's sad, because you're one of the best at what you do."

51. Employees subordinate to Mr. Kamens knew more about the circumstances of his employment than Mr. Kamens himself.

52. The breaches of Mr. Kamens's contract were not limited to the elimination of his primary work responsibilities.

53. The Agreement granted Mr. Kamens "a minimum guaranteed commission of [f]ifty thousand . . . dollars [($50,000)] per year and same shall be paid in monthly installments of [four thousand one hundred sixty-six dollars and sixty-seven cents] $4,166.67 at the end of every month." Mr. Kamens never received any such payment.

54.   These amounts are nominal in comparison with the damages that arose out of the other breaches.

55.   Mr. Kamens's contract assured him two (2) full years of employment, of which he served merely three (3) months.

56.   At a salary of three hundred thousand dollars ($300,000) with a minimum of fifty thousand dollars ($50,000) annual commission, the material breaches will result in damages of over six hundred thousand dollars ($600,000) in base pay alone.

57.   The Agreement states that "[e]xecutive shall be entitled to share [t]hree ... percent [(3%)] of the ... [n]et [o]perating profit ... of the Company." That profit-sharing arrangement, in addition to a commission of up to one and one-quarter percent (1.25%) on showroom sales and a half a percent (0.5%) commission on inventory sales, combined with Mr. Kamens's base pay, constitutes lost wages well over one million dollars ($1,000,000).

58.   In addition to the material breaches and fraud outlined above, Mr. Kamens has also been subjected to tortious interference with his right to conduct business. The apparel industry is insular. Mr. Kamens's reputation has been seriously and irreversibly damaged by, *inter alia*, At Last's, Mr. Ahuja's, and Mr. Israni's chicanery and amateurism.

59.   Mr. Kamens came to At Last after more than two (2) decades of meteoric success in his industry. At Last's and Third-Party Defendants' deleterious effects on his reputation and on the arc of his continued career have denied him incalculable future earnings.

60.   Mr. Kamens's tenure with At Last also cost him physically. His sleep and digestion have undergone dire deterioration.

61.   Mr. Kamens has made numerous doctor visits in order to address the effects of the undue stress induced by the constant harassment at work.

**D.      Jury Demand**

62.     Defendant and Third-Party Plaintiff Michael Kamens hereby renews his demand for a trial before a jury. *See Docket*, "Jury Demand: Defendant" *and Docket Entry 10*, "JURY DEMAND."

## II.     COUNTERCLAIMS AGAINST AT LAST

### FIRST COUNTERCLAIM
### Fraudulent Misrepresentation against At Last

63.     Mr. Kamens hereby realleges and incorporates each and every allegation *supra* with the same force and effect as though separately alleged and reiterated herein.

64.     At Last made material misrepresentations to Mr. Kamens, whom it intended to defraud.

65.     Mr. Kamens reasonably relied on what he believed to be At Last's good-faith representations.

66.     Mr. Kamens was shown purported profits of At Last, including those regarding Wal-Mart, which were patent lies.

67.     Mr. Kamens's bonus was to be based on sales, including sales to Wal-Mart, which At Last represented would be significantly higher. The sales that Mr. Kamens was told he could expect were based on intentional and material representations.

68.     At Last's material misrepresentations caused damage to Mr. Kamens, including substantial economic loss.

### SECOND COUNTERCLAIM
### Breach of Contract against At Last

69.     Mr. Kamens hereby realleges and incorporates each and every allegation *supra* with the same force and effect as though separately alleged and reiterated herein.

70. The Agreement set out a contract between Mr. Kamens and At Last.

71. To the extent that the contract is not void *ab initio*, it was breached by, *inter alia*, At Last's elimination of Mr. Kamens's position and At Last's failure to pay Mr. Kamens substantial owed compensation. The latter produced damages in excess of one million dollars ($1,000,000).

### III. THIRD-PARTY COMPLAINT CLAIMS

#### FIRST CLAIM OF THE THIRD-PARTY COMPLAINT
#### Fraudulent Misrepresentation against Sunil Ahuja and Sanjay Israni

72. Mr. Kamens hereby realleges and incorporates each and every allegation *supra* with the same force and effect as though separately alleged and reiterated herein.

73. Mr. Ahuja and Mr. Israni made material misrepresentations to Mr. Kamens, whom they intended to defraud.

74. Mr. Kamens reasonably relied on what he believed to be Mr. Ahuja's and Mr. Israni's good-faith representations.

75. Mr. Ahuja and Mr. Israni showed Mr. Kamens the purported profits of At Last's, including those regarding Wal-Mart, which were patent lies.

76. Moreover, as Mr. Kamens's bonus was to be based on sales, but the sales that Mr. Kamens was told he could expect were based on fraudulent material misrepresentations.

77. Mr. Ahuja's and Mr. Israni's material misrepresentations caused damage to Mr. Kamens.

### SECOND CLAIM OF THE THIRD-PARTY COMPLAINT
### Tortious Interference with Contract against Bonni Duchon

78. Mr. Kamens hereby realleges and incorporates each and every allegation *supra* with the same force and effect as though separately alleged and reiterated herein.

79. Ms. Duchon made it impossible for Mr. Kamens to do his job, thereby interfering with his contract as it was memorialized in the Agreement.

80. Mr. Ahuja, Ms. Duchon, and At Last were fully aware of Mr. Kamens's contract, which they created.

81. That contract placed Mr. Kamens in a supervisory role above Ms. Duchon.

82. This arrangement was repeatedly reiterated verbally and in writing by Mr. Ahuja.

83. Nonetheless, At Last and Mr. Ahuja encouraged Ms. Duchon to encroach upon Mr. Kamens's business and allowed her to terrorize him during work hours.

### THIRD CLAIM OF THE THIRD-PARTY COMPLAINT
### Tortious Interference with Prospective Economic Advantage and Tortious Interference with Business Relations against Bonni Duchon

84. Mr. Kamens hereby realleges and incorporates each and every allegation *supra* with the same force and effect as though separately alleged and reiterated herein.

85. Mr. Kamens's future earning prospects and reputation were irreparably damaged by Ms. Duchon's harassment.

86. Ms. Duchon engaged in a campaign to prevent Mr. Kamens from performing his job completely.

## IV. PRAYER FOR RELIEF

For the reasons set forth *supra*, Michael Kamens respectfully requests that the Court grant the following relief, including that:

(i) The Complaint be dismissed in its entirety;

(ii) Mr. Kamens be awarded:

  (a) Costs;

  (b) Expenses;

  (c) Disbursements;

  (d) Punitive damages; and

  (e) Reasonable attorneys' fees incurred in connection with this action; and

(iii) On the First Counterclaim against At Last, actual damages to be determined at trial, but in no event less than five million dollars ($5,000,000);

(iv) On the Second Counterclaim against At Last, actual damages to be determined at trial, but in no event less than one million dollars ($1,000,000);

(v) On the First Claim of the Third-Party Complaint, against Sunil Ahuja, actual damages to be determined at trial, but in no event less than fifteen million dollars ($15,000,000);

(vi) On the Second Claim of the Third-Party Complaint, against Bonni Duchon, actual damages to be determined at trial, but in no event less than one million five hundred thousand dollars ($1,500,000);

(vii) On the Third Claim of the Third-Party Complaint, against Bonni Duchon, actual damages to be determined at trial, but in no event less than one million five hundred thousand dollars ($1,500,000);

(viii) Such other and further relief as this Court may deem just and proper.

Dated: New York, New York  
August 15, 2013

Respectfully submitted by:  
THE HARMAN FIRM, PC  
*Counsel for Michael Kamens*

_____  
Walker G. Harman, Jr. [WH-8044]  
200 West 57th Street, Suite 900  
New York, New York 10019  
(212) 425-2600  
wharman@theharmanfirm.com